Dawn Barnes v. South Carolina State University

# EXHIBIT A
# NOTICE OF REMOVAL

## *State Court Pleadings*

ELECTRONICALLY FILED - 2023 Jun 30 1:49 PM - ORANGEBURG - COMMON PLEAS - CASE#2023CP3800918

**STATE OF SOUTH CAROLINA**
**COUNTY OF ORANGEBURG**

Dawn Barnes,

                 Plaintiff,

   v.

South Carolina State University,

              Defendant.

**IN THE COURT OF COMMON PLEAS**
**FOR THE FIRST JUDICIAL CIRCUIT**


**SUMMONS**

**TO THE DEFENDANT ABOVE-NAMED:**

    YOU ARE HEREBY SUMMONED and required to answer the Complaint, a copy of which is served upon you, and to serve a copy of our to this Complaint upon the subscriber at the address shown below within thirty (30) days (thirty five (35) days if served by United States Mail) after serve hereof, exclusive of the date of such service, and if you fail to answer the Complaint, judgment by default will be rendered against you for the relief demanded in the Complaint.

    s/ Samantha Albrecht
Samantha Albrecht (Bar ID 102642)
BURNETTE SHUTT & MCDANIEL, PA
912 Lady Street, 2nd Floor (29201)
Post Office Box 1929
Columbia, South Carolina 29202
T: 803.904.7933
F: 803.904.7910
salbrecht@burnetteshutt.law

**ATTORNEYS FOR PLAINTIFF**

June 30, 2023
Columbia, South Carolina

ELECTRONICALLY FILED - 2023 Jun 30 1:49 PM - ORANGEBURG - COMMON PLEAS - CASE#2023CP3800918

| | |
|---|---|
| **STATE OF SOUTH CAROLINA**<br>**COUNTY OF ORANGEBURG** | **IN THE COURT OF COMMON PLEAS**<br>**FOR THE FIRST JUDICIAL CIRCUIT** |
| Dawn Barnes, | |
| Plaintiff, | |
| v. | **COMPLAINT**<br>(Jury Trial Demanded) |
| South Carolina State University, | |
| Defendant. | |

Plaintiff complaining of the defendant respectfully alleges as follows:

## NATURE OF THE ACTION

1.     Plaintiff brings claims under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 et seq., and the regulations and policies promulgated pursuant to that law and the Equal Pay Act.

2.     Defendant has discriminated and continues to discriminate against Barnes in the terms and conditions of her employment because of the sex of the student athletes she coached and her sex. Defendant failed to provide Coach Dawn Barnes with the personnel and resources necessary to properly run the women's Volleyball program and subjected her to a hostile environment and adverse work actions preventing her from being as successful as she could be with the proper support like that provided to coaches of men's teams, thus limiting her career prospects.

## PARTIES, JURISDICTION, AND VENUE

3.     Plaintiff, Dawn Barnes, is a citizen and resident of Lexington County South Carolina. Plaintiff was a female couch of a female athletic team at Defendant University.

4.     Defendant, South Carolina State University, is an agency of the State of South Carolina with its primary campus located in Orangeburg County, South Carolina.

2

ELECTRONICALLY FILED - 2023 Jun 30 1:49 PM - ORANGEBURG - COMMON PLEAS - CASE#2023CP3800918

5.     Jurisdiction and venue are proper, because the parties have sufficient connections to this circuit, and the events giving rise to this action occurred in Orangeburg County, South Carolina.

**GENERAL ALLEGATIONS**
**THE REQUIREMENTS OF TITLE IX**

6.     Title IX says, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

7.     The Civil Rights Restoration Act of 1987 made plain Congress' intent that the terms "program or activity," as used in Title IX, mean any program or activity so long as any part of the public institution receives federal financial assistance. 20 U.S.C. §1687. Thus, Defendant is subject to Title IX even if none of the funding for either its men's or women's athletic program comes from federal sources, if it otherwise receives federal assistance.

8.     Applying Title IX to intercollegiate athletics, OCR has adopted regulations requiring educational institutions receiving federal funds to "provide equal athletic opportunity for members of both sexes." 34 C.F.R. § 106.41(c).

9.     The regulations, codified at 34 C.F.R. Part 106 are enforced by OCR.

10.    34 C.F.R. § 106.41(c) specifies ten (10) non-exclusive factors that may be considered in the determination of equal athletic opportunity:

a.     Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes;

b.     The provision of equipment and supplies;

3

ELECTRONICALLY FILED - 2023 Jun 30 1:49 PM - ORANGEBURG - COMMON PLEAS - CASE#2023CP3800918

c.     Scheduling of games and practice time;

d.     Travel and per diem allowance;

e.     Opportunity to receive coaching and academic tutoring;

f.     Assignment and compensation of coaches and tutors;

g.     Provision of locker rooms, practice, and competitive facilities;

h.     Provision of medical and training services;

i.     Provision of housing and dining facilities and services; and

j.     Publicity.

Other factors to be considered are a school's "failure to provide necessary funds for teams for one sex" and recruiting.

11.    In 1979, OCR issued a policy interpretation of Title IX and the Regulations as applied to intercollegiate athletics at 44 Fed. Reg. 71,413 (Dec. 11, 1979).

12.    The OCR Policy Interpretation sets forth three areas of compliance under Title IX as it relates to college sports: (1) equal accommodation of student interests and abilities; (2) equal athletic financial assistance; and (3) equal treatment and benefits.

13.    According to the Policy Interpretation, compliance in the first prong of equal athletic participation opportunities is determined under the following three-part test:

a.     whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments;

b.     where the members of one sex have been and are under-represented among intercollegiate athletes, whether the institution can show a

ELECTRONICALLY FILED - 2023 Jun 30 1:49 PM - ORANGEBURG - COMMON PLEAS - CASE#2023CP3800918

history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex; or

    c.    where the members of one sex are under-represented among intercollegiate athletes and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

See 44 Fed. Reg. 71,418.

    14.    This three-part test was further clarified after notice and comment in OCR's 1996 Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test (the "1996 OCR Clarification"), making clear that "participation opportunities must be real, not illusory."

    15.    The Regulations require that sponsors of intercollegiate athletics (such as Defendant) take such remedial actions as are necessary to overcome the effects of sex discrimination in violation of Title IX. See 34 C.F.R. §106.3(a). Defendant has not taken any recent remedial actions to satisfy its obligations under Title IX. Nor has Defendant ever provided females with an equal opportunity to participate in varsity athletics or provided equal treatment and benefits to its female athletes, and any remedial actions which Defendant has taken in the past years have been insufficient to satisfy Defendant's obligations under Title IX.

    16.    The Regulations also require that federal fund recipients like Defendant adopt nondiscrimination policies and grievance procedures, appoint and train Title IX officers to receive and investigate sex discrimination complaints, and disseminate this

ELECTRONICALLY FILED - 2023 Jun 30 1:49 PM - ORANGEBURG - COMMON PLEAS - CASE#2023CP3800918

information to all students, faculty, and employees. 34 C.F.R. §§106.8 & 106.9. The Regulations further require that recipients promise and confirm compliance by filing an Assurance of Compliance with DOE each time they apply for or receive federal financial assistance. 34 C.F.R. §106.4.

17.     The Regulations further require that sponsors of interscholastic athletics comply with the athletics regulations within three years of their effective date (which was July 21, 1975). Defendant did not comply with the athletic regulations by the 1978 compliance deadline or at any time thereafter. Now, more than 40 years later, Defendant still does not fully comply with Title IX.

18.     Section 106.51(a)(3) states: "A recipient shall not enter into any contractual or other relationship which directly or indirectly has the effect of subjecting employees or students to discrimination."

19.     Title IX's prohibition of discrimination based on sex covers, among other things: compensation, job assignments, fringe benefits, and any other term, condition, or privilege of employment. 34 C.F.R. §106.51(b). Title IX prohibits sex discrimination in employment based upon the sex of the employee and based upon the sex of the students taught or athletes coached.

## SEX-BASED DISPARITIES IN DEFENDANT'S ATHLETICS PROGRAM

20.     The Regulations, as set forth above, require that sponsors of interscholastic athletics comply with the athletic regulations within three years of their effective day, the deadline for which was July 21, 1975.

21.     After forty years, Defendant has yet to fully comply with Title IX.

ELECTRONICALLY FILED - 2023 Jun 30 1:49 PM - ORANGEBURG - COMMON PLEAS - CASE#2023CP3800918

22.    Defendant has not taken any remedial actions to satisfy its obligations under Title IX.

23.    Defendant continues to deny females an equal opportunity to participate in varsity athletics or provided equal treatment and benefits to its female athletes, and any remedial actions which Defendant has taken in the past have been insufficient to satisfy Defendant's obligations under Title IX.

24.    As set forth above, a school's provision of equal treatment and benefits to those with participation opportunities is assessed based on an overall comparison of the male and female student athletic programs and the student body as a whole.

25.    Defendant has unlawfully discriminated against female student athletes in violation of Title IX with respect to athletic treatment and benefits in many areas outlined in more detail below.

26.    The information summarized in the chart and paragraphs below was submitted by Defendant to the federal government:

| Reporting Year | Female Undergraduate Students | Female Student Athletes | Percent of Female Athletes out of Enrolled Females | Male Undergraduate Students | Male Student Athletes | Percent of Male Athletes out of Enrolled Males |
|---|---|---|---|---|---|---|
| 2019 | 1045 | 91 | 8.708% | 913 | 151 | 16.539% |
| 2020 | 1023 | 78 | 7.625% | 758 | 108 | 14.248% |
| 2021 | 1028 | 84 | 8.171% | 805 | 141 | 17.516% |

| Reporting Year | Female Student Athletes | Female Aid Awarded | Female Recruiting Expenses, All Teams | Male Student Athletes | Male Aid Awarded | Male Recruiting Expenses, All Teams |
|---|---|---|---|---|---|---|
| 2019 | 91 | $951,667 | $20,911 | 151 | $1,670,562 | $27,434 |

ELECTRONICALLY FILED - 2023 Jun 30 1:49 PM - ORANGEBURG - COMMON PLEAS - CASE#2023CP3800918

| 2020 | 78 | $773,428 | $5,331 | 108 | $1,272,478 | $6,110 |
| 2021 | 84 | $910,761 | $3,846 | 141 | $1,458,141 | $17,648 |

27.    Defendant has not demonstrated any justification for DEFEDEANT SC STATE's failure to provide female student-athletes with equal financial aid or female athletic teams with equal recruiting funding that does not reflect underlying discrimination—and Plaintiff is not aware of any.

28.    Defendant provided the below to the federal government regarding coaching salaries:

| | Number of Head Coaches | | Head Coach Salary (Averaged) | | Annual Salary per FTE Head Coach | |
|---|---|---|---|---|---|---|
| Reporting Year | Men | Women | Men's | Women's | Men's | Women's |
| 2019 | 4 | 6 | $124,888 | $53,131 | $166,517 | $63,757 |
| 2020 | 4 | 6 | $127,103 | $60,785 | $169,471 | $72,942 |
| 2021 | 4 | 6 | $124,296 | $49,257 | $165,861 | $59,108 |

| | Number of Assistant Coaches | | Assistant Coach Salary (Averaged) | | Annual Salary per FTE Assistant Coach | |
|---|---|---|---|---|---|---|
| Reporting Year | Men | Women | Men's | Women's | Men's | Women's |
| 2019 | 14 | 6 | $43,862 | $23,408 | $47,517 | $32,711 |
| 2020 | 14 | 6 | $40,216 | $23,692 | $43,310 | $31,589 |
| 2021 | 13 | 7 | $44,954 | $24,182 | $46,619 | $32,771 |

## **PLAINTIFF'S TENURE WITH DEFENDANT SC STATE**

29.    Plaintiff is a veteran volleyball coach, with a coaching career spanning over thirty years.

ELECTRONICALLY FILED - 2023 Jun 30 1:49 PM - ORANGEBURG - COMMON PLEAS - CASE#2023CP3800918

30.    Plaintiff has a longstanding history as an effective volleyball coach, and she is known for being a strong technical trainer.

31.    In July 2020, Defendant hired Plaintiff as the SC State Head Women's Volleyball Coach.

32.    Throughout Plaintiff's employment with Defendant, Plaintiff performed her job duties in a competent if not more than competent manner.

33.    At the time of Plaintiff's hire, COVID was running rampant, creating myriad impediments to athletic and scholastic activities.

34.    For at least three years prior to Plaintiff's arrival at Defendant SC State, the women's volleyball team had an Academic Progress Rate (APR) below 930, placing their team at risk for sanctions.

35.    The volleyball team's APR increased throughout Plaintiff's tenure with Defendant University.

36.    Defendant provided Plaintiff with an annual salary of approximately $51,000, which is significantly below the salaries Defendant provided to the coaches for male teams.

37.    Furthermore, Plaintiff was provided little to no support from Defendant SC State for her team.

38.    Defendant failed to fully fund the women's volleyball team, providing only eight scholarships, despite the need for twelve scholarships to be a headcount sport.

39.    Additionally, while the men's athletic teams were able to order several pairs of shoes, uniforms, and equipment for their teams, women's teams, and particularly the

ELECTRONICALLY FILED - 2023 Jun 30 1:49 PM - ORANGEBURG - COMMON PLEAS - CASE#2023CP3800918

women's volleyball team, Defendant provided limited funding for the women's purchase of equipment and gear.

40.     Plaintiff was only able to order only a single pair of shoes for each volleyball player, while male athletic teams ordered several pairs of shoes for each player.

41.     Plaintiff could order only a single uniform for her players, which precluded any opportunity to bring on a walk-on player or any other interested students.

42.     Furthermore, Defendant's failure to adequately fund the volleyball team meant that the team had to wear mismatched uniforms.

43.     Parents of the volleyball players often had to go out and buy gear for the students when they traveled, while male teams were provided cold weather gear and duffel bags for travel.

44.     While Defendant authorized and funded air travel for the men's teams, Defendant told Plaintiff that women's teams could only travel by bus to away matches and tournaments.

45.     However, bus travel was incredibly challenging to arrange, as Defendant had large outstanding balances with the bus companies it suggested that Plaintiff could use.

46.     Plaintiff would have to put in Request for Proposals (RFP) for her travel, but she would not get the funds cleared until after the team began traveling.

47.     Consequently, Plaintiff had to personally fund travel expenses for the volleyball team.

48.     Additionally, while Defendant funded catered meals for the men's teams, Plaintiff would have to get boxed lunches from the cafeteria for her student-athletes.

ELECTRONICALLY FILED - 2023 Jun 30 1:49 PM - ORANGEBURG - COMMON PLEAS - CASE#2023CP3800918

49.    Despite the paucity of support from Defendant, Plaintiff was devoted to her student athletes and worked tirelessly to ensure both their academic and athletic success.

50.    Still, Plaintiff and volleyball team experienced a multitude of challenges as they sought to success on and off the court.

51.    The volleyball team's home gym was Dukes Gym, a poorly maintained facility rife with infestations of various rodents. Dukes Gym is the oldest athletic facility on campus. It has been categorized under student government use not for athletics use, and the sole intercollegiate team assigned to the facility is the women's volleyball team.

52.    Because of the ceiling leaking in Dukes Gym whenever it rained, preseason practices during Fall 2021 had to be moved to Orangeburg High School for a week when it rained. On another occasion, there were issues with the floors in the gym which caused additional practices to be moved to the high school gym.

53.    Upon information and belief, no men's teams have had to hold practices at a high school gym.

54.    No men's intercollegiate team at Defendant SC State is assigned to Dukes Gym.

55.    Additionally, Battiste Hall, the residence hall to many of the volleyball team's players, posed many health and safety concerns. Plaintiff raised concerns about this to Defendant.

56.    On January 12, 2021, Plaintiff sent an email to Defendant's administrative staff reporting a number of concerns including a dead squirrel that was outside her office in Dukes gym, dead rats behind the cheerleading mats in Dukes that Plaintiff's players found when shagging balls, and a live baby opossum that was caught in a rat trap that

ELECTRONICALLY FILED - 2023 Jun 30 1:49 PM - ORANGEBURG - COMMON PLEAS - CASE#2023CP3800918

had been set up in Dukes gym. Plaintiff's email contained the following images:



57.    Plaintiff also made phone calls about these issues to Danley, Davis, and Dawson. Plaintiff was told that practice could continue. When Plaintiff further expressed concerns about animal feces and urine on the gym floor, the Director of Facilities, Paul Platt was sent to wipe up the floor and put the live, still moving opossum in a plastic bag. Dawson told the players they could decide whether to leave or stay for practice. Some players stayed for the first part of practice but after seeing more animal feces, they left.

58.    Following this incident, the volleyball players went together to voice their concerns about the state of Dukes gym to Danley. Danley was not in his office so the players spoke with his administrative assistant, Patrice Benson.

59.    On January 25, 2021, Plaintiff made a complaint to then athletic director, Stacy Danley, about the ceiling conditions of Battiste Hall, which caused Barnes concern for the health of her players.

60.    In response, Danley told Plaintiff to stay out of the matter and let housing deal with it.

61.    Game Day set up was to be handled by Defendant's equipment manager, Sidney Fulton, and Kendrick Lewis. This was not one of Plaintiff's job duties. Despite this,

ELECTRONICALLY FILED - 2023 Jun 30 1:49 PM - ORANGEBURG - COMMON PLEAS - CASE#2023CP3800918

Defendant prioritized the soccer and football teams. When games or practices were scheduled at the same time, Defendant would send staff to help with soccer and football and would require Plaintiff to set up for volleyball including setting up the nets, chairs, and speakers.

62.    When soccer games and volleyball games were scheduled for the same times, the shared PA system would be sent to the soccer game and the volleyball team would not have a PA system available for their game. The game would then be played without an announcer to announce the starting lineup or play the National Anthem that is traditionally played before each match.

63.    On January 27, 2022, just two days after Plaintiff's most recent complaint to Danley, Defendant undertook an investigation of Plaintiff's players' countable athletically related activities (CARA) from the previous school year.

64.    On June 30, 2022, Plaintiff, along with several other female coaches, made a formal Title IX complaint against Danley.

65.    Because of the ceiling leaking in Dukes Gym whenever it rained, preseason practices took place at Claflin University instead of in any of Defendant's buildings. This begun during pre-season in August 2022. Despite this, the gym was not fixed and several games during the 2022 season and practices continued to take place at Claflin whenever it rained.

66.    Plaintiff would request to run ball drills in Smith-Hammond-Middleton Memorial Center (SHM), Defendant's main athletic facility, but was not permitted to do so.

ELECTRONICALLY FILED - 2023 Jun 30 1:49 PM - ORANGEBURG - COMMON PLEAS - CASE#2023CP3800918

67.     Around August 2022, Defendant had an outside consultant undertake an investigation of SC STATE's compliance with Title IX.

68.     Plaintiff complied fully with the Title IX investigation, and she candidly expressed her concerns to the investigator.

69.     In August and September of 2022, Plaintiff and her team were forced to practice under a leaking roof, requiring them to place garbage cans across the volleyball court and continue their practice around the garbage cans.

70.     Also, during the Fall 2022 semester, an outside agency came to install security cameras in and around Dukes gym. The employees of the security company notified Plaintiff of the large number of rodents in the gym, excessive rodent feces found, and warned that the conditions of the gym could be dangerous to the players.

71.     On September 10, 2022, shortly after Plaintiff's compliance with the Title IX investigation, she was issued a formal reprimand alleging that "numerous" student athletes exceeded their hours and were "not accurately recorded."

72.     As a result, Defendant limited the volleyball's team to only sixteen CARA hours a week for eight consecutive weeks and then one week again in the spring 2023 semester.

73.     Defendant's reduction of the women's volleyball team's practice time was pretextual and retaliation for Plaintiff's complaints about discriminatory treatment of her and the women's volleyball team.

74.     On September 28, 2022, Plaintiff provided the following photos to notify them of rat droppings in the women's locker room in Dukes' Gym that she received from

ELECTRONICALLY FILED - 2023 Jun 30 1:49 PM - ORANGEBURG - COMMON PLEAS - CASE#2023CP3800918

the security company to Danley, Lewis, Davis, Dr. Jefferies Jackson, and President Conyers:



75. Plaintiff was told that an exterminator had been scheduled but then had a family emergency and did not show up. Upon information and belief, an exterminator never came.

76.    Davis replied that day he would call an exterminator. Plaintiff is not aware of an exterminator ever coming to Dukes Gym in response to this complaint.

77.    On September 29, 2022, Plaintiff emailed Davis to notify him that the Dukes Gym roof was leaking from the rain.

78.    Davis replied and indicated that he was "dealing" with the roof.

79.    Plaintiff was notified by Danley and Lewis that Defendant would do a walk-through of Dukes, to determine if Dukes Gym would need to be shut down.

80.    However, when Plaintiff reached out about the walk-through, Davis indicated he was out of town.

81.    The following Saturday September 30, a volleyball game was scheduled against Coppin State at Defendant. Due to rain and the ceiling of Dukes gym leaking, the game had to be postponed.

ELECTRONICALLY FILED - 2023 Jun 30 1:49 PM - ORANGEBURG - COMMON PLEAS - CASE#2023CP3800918

82.    On October 3, 2022, Plaintiff attended and coached the volleyball team at their match against USC Upstate.

83.    On October 4, 2022, Plaintiff received a call from Campbell, who asked Plaintiff to meet her in the human resources conference room in Lohman Hall.

84.    When Plaintiff arrived, she found Campbell and Human Resources Director Ron York in the room.

85.    Citing only "her record" as justification, Campbell and York presented Plaintiff with a termination letter, asked if she had any questions, then indicated that she would need to get signatures from all the Athletic Department supervisors and turn in her keys.

86.    From 2016 to 2022, SC State's women's volleyball team has a record of 2-164, which amounts to two wins out of one hundred and sixty-four games over six years.

87.    The SC State volleyball team has not won a single game since 2018.

88.    Plaintiff's record was not a result of her failure as a coach, but rather a direct consequence of Defendant's longstanding failure to provide adequate resources for its women's athletic teams, including volleyball.

**FIRST CAUSE OF ACTION**
**(Violation of SC Whistleblower Protection Act)**

89.    Plaintiff realleges the foregoing paragraphs where consistent.

90.    Plaintiff made complaints to Defendant regarding occupational safety and health concerns with working and practicing in Dukes Gym.

91.    These complaints were protected under S.C. Code §41-15-510.

92.    In response to these protected complaints, Defendant subjected Plaintiff to discriminatory and retaliatory treatment including but not limited to subjecting Plaintiff to

ELECTRONICALLY FILED - 2023 Jun 30 1:49 PM - ORANGEBURG - COMMON PLEAS - CASE#2023CP3800918

a hostile work environment, issuing pretextual disciplinary action and terminating Plaintiff's employment for pretextual reasons.

93.    The same amounts to a violation of S.C. Code §41-15-520. As a result of Defendant's conduct Plaintiff as been damaged.

94.    Subject to S.C. Code §8-27-30 Plaintiff seeks reinstatement to her former position, lost wages, actual damages, and reasonable attorney fees as determined by the court.

## SECOND CAUSE OF ACTION
### (Defamation)

95.    Plaintiff realleges the foregoing paragraphs where consistent.

96.    Defendant, through its employees and representatives accused Plaintiff of poor performance, being incompetent, and being unfit in her professional field. Such accusations have a defamatory meaning about Plaintiff and are false.

97.    Defendant knew that such allegations surrounding Plaintiff were false. Defendants further recklessly disregarded the truth in taking action against Plaintiff's career.

98.    The accusations of Defendant and actions associated therewith have defamed the Plaintiff by word and act.

99.    Such statements were false, known to be false, and maliciously published by Defendant to members of administration, members of the community, and Plaintiff's peers and colleagues. Such publications were made with malice, mean-spirit, and without justification.

100.    Further, such statements are defamatory *per se* as they accuse Plaintiff of being unfit to participate in her professional field.

ELECTRONICALLY FILED - 2023 Jun 30 1:49 PM - ORANGEBURG - COMMON PLEAS - CASE#2023CP3800918

101.    As a result, Plaintiff has suffered severe economic losses and reputational loss both professionally and personally; Defendants caused and is liable to Plaintiff for the same.

102.    As a direct and proximate result of the defamation alleged herein, Defendants have caused and are liable for severe and continuing injury to Plaintiff's reputation, loss of wages and benefits, diminished earning capacity and future benefits, humiliation, embarrassment, pain and suffering, severe stress and anxiety, loss of sleep, and other losses. Plaintiff is also entitled to pre-judgment interests, as well as attorney's fees, pursuant to S.C. Code Ann. § 15-77-300.

### THIRD CAUSE OF ACTION
**(Violation of Title IX)**

103.    Plaintiff realleges the foregoing paragraphs where consistent.

104.    Defendant discriminated against Plaintiff based on her sex and because she is the coach of a women's volleyball team and because she is female.

105.    Defendant further did not provide the women's teams with equal funding, coaching staff, supplies, facilities, or support.

106.    Plaintiff was employed by Defendant from July 2020 to October 2022.

107.    Plaintiff performed work requiring substantially equal skill, effort, and responsibility under similar working conditions as male head coaches.

108.    Plaintiff was paid less than Defendant's male coaches performing substantially the same work under similar circumstances.

109.    As a result of Defendant's actions, Plaintiff has experienced anxiety, depression, and other psychological and physical manifestations of such distress.

ELECTRONICALLY FILED - 2023 Jun 30 1:49 PM - ORANGEBURG - COMMON PLEAS - CASE#2023CP3800918

110.    As a result of Defendant's actions, Plaintiff has been damaged in the form of lost employment, lost compensation, and benefits, lost professional status and reputation, lost resources for her to do her job similar to those provided to coaches of men's sports, and loss of future employment opportunities. Such discrimination has caused Plaintiff pain, humiliation, emotional distress including anxiety, depression, other psychological and physical manifestations of such distress, and other damages.

### FOURTH CAUSE OF ACTION
**(Title IX Retaliation)**

111.    Plaintiff realleges the foregoing paragraphs where consistent.

112.    Plaintiff engaged in protected activity when she made complaints to Defendant about unequal treatment of her players compared to the treatment of the men's athletic teams including but not limited to complaints about the condition of practice space, budgets, and resources provided to her players.

113.    Plaintiff also participated in protected activity by complying with the Title IX investigation of Defendant's athletic teams.

114.    Defendant subjected Plaintiff to pretextual disciplinary action and ultimately terminated her employment for pretextual reasons in retaliation for these complaints.

115.    The actions taken against Plaintiff and the actions which have resulted in her disparate treatment and damages are the result of the planned and concerted effort to retaliate against the Plaintiff for her complaints about discriminatory treatment of the women's volleyball team and her participation in the Title IX investigation.

116.    Defendant is liable to the Plaintiff for the willful, wrongful, and bad faith retaliation against the Plaintiff for protected actions she took opposing unfair, and

ELECTRONICALLY FILED - 2023 Jun 30 1:49 PM - ORANGEBURG - COMMON PLEAS - CASE#2023CP3800918

egregious discrimination on the basis of sex. Plaintiff is entitled to an award of actual damages as well as reasonable attorney's fees and for the cost of this action.

## FIFTH CAUSE OF ACTION
### (Violation of the Equal Pay Act)

117.    Plaintiff realleges the foregoing paragraphs where consistent.

118.    Plaintiff was paid less for equal work (requiring equal skill, effort, and responsibility) than situated similar males.

119.    Defendant does not have a seniority, merit, or quality/quantity system of compensation.

120.    The disparate pay discussed herein was not made on factors other than sex.

121.    The disparate pay described herein violates the equal pay act.

122.    The Defendant is liable for the Plaintiff for the willful violation of the Equal Pay Act alleged herein and damages caused thereby including, but not limited to, the amount of underpayment for the three years before the date of the lawsuit is filed through the date of the verdict and an additional equal amount as liquidated damages. Plaintiff also requests pre-judgment interest and attorney's fees and costs of this action. Plaintiff last requests equitable relief including a correction to the underpayment at issue.

## PRAYER FOR RELIEF

WHEREFORE, for the actions alleged above, Plaintiff prays for judgment to be awarded against the Defendant SC State for all recoverable damages she has suffered as a result of the as alleged herein in an appropriate amount to be determined by a jury; as well as any restitution or equitable action this Court should deem proper. Plaintiff is further entitled to Attorney's Fees and Costs in accord with State and Federal Law.

ELECTRONICALLY FILED - 2023 Jun 30 1:49 PM - ORANGEBURG - COMMON PLEAS - CASE#2023CP3800918

Plaintiff also requests injunctive relief to be deemed just and proper. Last, Plaintiff requests pre- and post-judgment interest be awarded on all her damages.

s/ Samantha Albrecht
Samantha Albrecht (Bar ID 102642)
BURNETTE SHUTT & MCDANIEL, PA
912 Lady Street, 2nd Floor (29201)
Post Office Box 1929
Columbia, South Carolina 29202
T: 803.904.7933
F: 803.904.7910
salbrecht@burnetteshutt.law

**ATTORNEYS FOR PLAINTIFF**

June 30, 2023
Columbia, South Carolina